

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| **CIRCUIT CITY STORES, INC.,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **vs.** | ) | **No. SC93687** |
| | ) | |
| **DIRECTOR OF REVENUE,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**consolidated with**

| | | |
|---|---|---|
| **DILLARD'S, INC.,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **vs.** | ) | **No. SC93711** |
| | ) | |
| **DIRECTOR OF REVENUE,** | ) | |
| | ) | |
| **Appellant.** | ) | |

### PETITIONS FOR REVIEW OF DECISIONS OF THE
### ADMINISTRATIVE HEARING COMMISSION
**The Honorable Sreenivasa Rao Dandamudi, Commissioner**

*Opinion issued July 29, 2014*

Circuit City and Dillard's offered customers the opportunity to finance their purchases through private label credit cards. The cards were issued by banks with which each retailer had negotiated agreements. The bank immediately paid to the retailer the full amount of the purchase, including sales tax, for each transaction made using the private label credit card. The retailer then remitted the applicable sales tax to the State.

A customer's payments on the credit card went to the issuing bank. If a customer failed to pay his or her credit card debt, the issuing bank took any tax write off, as the retailer had been paid fully at the time of sale. Although neither Circuit City nor Dillard's suffered any loss on these purchases or on the payment of sales tax based on these purchases, both retailers nonetheless applied for refunds of the sales tax that the banks had written off. The Administrative Hearing Commission (AHC) held that the Director of Revenue erred in denying these refund claims.

The Director petitions for review. This Court reverses and remands.[1] The retailers are incorrect in arguing that section 144.190.2, RSMo Supp. 2013,[2] considered alone or in conjunction with 12 CSR 10-102.100,[3] permitted them to be treated solely for sales tax refund purposes as a single organizational entity with the banks. The retailers and the banks are separate entities for sales tax refund purposes just as they concede they are separate entities for other purposes such as paying the sales tax, writing off the bad debt, or otherwise. Because, at the time of the initial transaction, the banks fully paid the retailers for both the amount of the sales tax and the amount of the purchase on which that tax was based, the retailers are not entitled to seek a refund of taxes the banks later wrote off.

---

[1] The two cases have been consolidated on appeal due to the similar nature of the legal issues presented.

[2] All statutory references are to RSMo 2000, unless otherwise indicated, as here.

[3] As discussed below, 12 CSR 10-102.100 allows for tax refunds on bad debts written off by a retailer only when there is a timing difference between the remission of sales tax to the State and full payment on the purchase, with a resulting write-off by the retailer as to certain customers who fail to pay after the tax is remitted. Here, the retailers received full payment from the banks at the time of sale and remittance of the sales tax to the State.

*I.* *STATEMENT OF FACTS*

Both Circuit City and Dillard's sold retail goods and were registered with the Missouri Department of Revenue. Both entered into contracts with banks to issue private label credit cards. Private label credit cards generally can be used only at the retail store named on the card or at one of its affiliates. In other words, Circuit City customers who obtained a Circuit City private label credit card could use it to charge purchases made at Circuit City and affiliated stores; Dillard's customers who obtained a Dillard's private label credit card could use it to charge purchases made at Dillard's and affiliated stores.

Circuit City partnered with JPMorgan Chase Bank NA[4] to operate and service its private label credit card accounts under a jointly negotiated program agreement. Under this agreement, Chase received and reviewed Circuit City customer credit card applications and decided whether to approve and issue a card. Chase also owned all Circuit City card accounts. Both Chase and Circuit City participated in developing and reviewing the card's marketing plan, and both provided training to staff members from the other company.

Dillard's partnered with GE Capital Consumer Card Co.[5] Like Chase, GE Capital owned, authorized, and issued all Dillard's credit cards. The program agreement between Dillard's and GE Capital included a predetermined approval rate and an income sharing

---

[4] Circuit City first established its private label credit card program through First North American National Bank, a wholly owned subsidiary, and then continued to operate the program through Bank One Delaware, N.A. Chase Bank is the successor to Bank One. This opinion will refer to the bank with which Circuit City contracted to provide its private label credit card as Chase.

agreement settled monthly based on program revenues and bad debts incurred. Fifteen GE Capital staff members worked out of Dillard's headquarters and stores to administer the private label card program.

Both program agreements contained the same type of payment mechanism. At the point of sale, the customer used the private label credit card to purchase the merchandise. The retailer then remitted to the Director the sales tax due. The agreements required the issuing bank to pay the retailer the full amount of the purchase price plus the sales tax the retailer would remit to the State minus whatever fee was negotiated. The customer's payments then would go to the bank issuing the card, either by direct payments to the bank or via in-store payments accepted at Circuit City and Dillard's stores. This financing arrangement meant that, although the cards were issued in the names of the retailers, if a customer failed to pay his or her bill, it was the bank that would suffer the loss and take the federal income tax write-off for uncollectable past due accounts.[6]

In 2010, Circuit City and Dillard's separately applied to the Director for a refund of sales tax amounts remitted to the State but later written off as bad debts by Chase and GE Capital, respectively. The Director denied both requests. The retailers appealed to the AHC, which reversed, allowing Circuit City and Dillard's to claim their respective sales tax refunds. The Director filed petitions for review in this Court. Because these cases involve the construction of a state revenue statute, this Court has exclusive

---

[5] Dillard's previously had operated its private label credit card through a wholly owned subsidiary, Dillard National Bank, before selling its card accounts to GE Capital.

appellate jurisdiction. *MO. CONST. art. V, § 3*.

## II. STANDARD OF REVIEW

A decision of the AHC will be affirmed if: (1) it is authorized by law; (2) it is supported by competent and substantial evidence based on the whole record; (3) mandatory procedural safeguards are not violated; and (4) it is not clearly contrary to the reasonable expectations of the legislature. *See MO. CONST. art. V, § 18*; *§ 621.193*; *Union Elec. Co. v. Dir. of Revenue, 425 S.W.3d 118, 121 (Mo. banc 2014), citing Brinker Missouri, Inc. v. Dir. of Revenue, 319 S.W.3d 433, 435 (Mo. banc 2010).* The Court reviews the AHC's interpretation of revenue statutes *de novo*. *Union Elec., 425 S.W.3d at 121*.

## III. THE RETAILERS ARE INELIGIBLE FOR A REFUND OF SALES TAX ON SALES THEY DID NOT THEMSELVES WRITE OFF

Circuit City and Dillard's claim eligibility for a sales tax refund under section 144.190.2, which states in relevant part:

> If any tax, penalty or interest has been paid more than once, or has been erroneously or illegally collected, or has been erroneously or illegally computed, such sum shall be credited on any taxes then due from the person legally obligated to remit the tax pursuant to sections 144.010 to 144.525, and the balance, with interest as determined by section 32.065, shall be refunded to the person legally obligated to remit the tax, but no such credit or refund shall be allowed unless duplicate copies of a claim for refund are filed within three years from date of overpayment.

In a retail sales transaction, the person statutorily obligated to remit the tax is the seller. *§ 144.080.1.* Title 12 CSR 10-102.100, promulgated by the Director to effectuate section

---

[6] *See 26 U.S.C. § 166(a)(2)* ("When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within

144.190.2, states that sales tax remitted by the seller on what turns out to be an uncollectible debt – that is, a transaction for which the seller remits to the State the full amount of sales tax owing but for which the seller ultimately does not receive full payment − is included within the statutory meaning of a tax "erroneously … collected" under section 144.190.2.[7]

The question before this Court is whether the retailers can claim sales tax refunds on any debts written off by the banks that issued the retailers' private label credit cards, even though the retailers themselves were paid fully by the banks for the purchases, including sales tax, and even though the retailers did not write off these debts nor do they claim they could have done so under federal tax law. To resolve this question, the Court looks first to the language of section 144.010, RSMo Supp. 2013, to determine whether the retailer is a "person" who can claim a sales tax refund in this circumstance under section 144.190.2 and related law. Section 144.010(7) defines "person" to include:

> any individual, firm, copartnership, joint adventure, association, corporation, municipal or private, and whether organized for profit or not, state, county, political subdivision, state department, commission, board, bureau or agency, except the state transportation department, estate, trust, business trust, receiver or trustee appointed by the state or federal court, syndicate, or *any other group or combination acting as a unit*, and the plural as well as the singular number …

(emphasis added). The retailers claim that they and the banks financing their private

---

the taxable year, as a deduction").
[7] The regulation defines "bad debt" as "a sale that has been written off for state or federal income tax purposes" provided the sale was "previously reported as taxable." *12 CSR 10-102.100(2)(A)*. The Director reserves the right to argue in a future case that the regulation is incorrect to the extent that it states that sales tax that was properly due when

label credit cards are "any other group or combination acting as a unit" and, therefore, they and the banks should be treated as a single "person" for purposes of receiving a sales tax refund, even though they concede they are not treated as a single person acting "as a unit" when paying sales tax, taking a tax write-off for bad debts, or for any other purpose.

While section 144.010(7) and prior cases do not define the meaning of "unit" as used in that statute,[8] "[a]bsent a definition in the statute, the plain and ordinary meaning is derived from the dictionary." *Cox v. Dir. of Revenue, 98 S.W.3d 548, 550 (Mo. banc 2003).* A "unit" is "a single thing or person or group that is a constituent and isolable member of some more inclusive whole: a member of an aggregate that is the least part to have clearly definable separate existence and that normally forms a basic element of organization within the aggregate." WEBSTER'S THIRD NEW INT'L DICTIONARY 2500 *(1993).*

Here there are two separate entities, or "isolable members," in each case − a retailer and a bank. The retailers and banks did not act as a single, "more inclusive whole" in remitting the sales tax, and the retailers do not argue that the banks were sellers who legally were required to remit the sales tax or that the banks improperly have failed to fulfill a retailer's statutory requirement to register with the State as sellers. The

_____

remitted constitutes tax "erroneously" collected, but concedes the argument for the purposes of this case.
[8] This Court has construed the phrase "acting as a unit" only in a factually distinguishable context. In *Charles v. Spradling,* the Court held that the inclusion of "any other group or combination acting as a unit" in section 144.010's definition of "person" does not allow "a class of unrelated individuals as to permit them to make a claim for refunds under Section 144.190 through a class action representative." *524 S.W.2d 820, 823 (Mo. banc 1975)* (internal citations omitted).

retailers argue only that they constitute a "unit" with the banks for purposes of obtaining a tax refund. They do so because they recognize that, absent treatment as a unit, neither the retailers nor the banks are entitled to seek a refund. Only the retailer is the entity "legally obligated to remit the tax" and, therefore, the one eligible to apply for a refund if it has suffered a loss, but only the bank has sustained bad debt write-off losses. The bank did not remit the tax and, so, is not entitled to seek a refund under Missouri law. The retailers, therefore, ask this Court to treat them as one entity with the banks for the sole purpose of trying to fulfill the prerequisites to obtaining sales tax refunds.

The statute does not so allow. Under the principle of construction known as *ejusdem generis*, context is important "in determining the scope and extent of more general words." *Standard Operations, Inc. v. Montague, 758 S.W.2d 442, 444 (Mo. banc 1988)*. A court, therefore, looks at the context in which a term is used to determine its meaning. As applied here, a court should look to the other types of entities listed in the statute to assist it in determining how the word "unit" is employed in a particular subsection. *See id.* (noting that, under this canon, "a document referring to 'horses, cattle, sheep and other animals' will usually be construed as including goats, but not bears or tigers").

Section 144.010(7) places the term "group or combination acting as a unit" at the end of a list of formal organizational structures, including "firm," "copartnership," and "association." The phrase "group or combination acting as a unit," therefore, is best understood as including types of joint entities that, although not specifically listed or organized through the listed recognized forms, still, like those listed, operate as a single

organization. Dillard's, Circuit City, and their respective banks do not fit within this statutory scheme. They entered into contractual relationships to finance customer purchases using private label credit cards. They have not associated or formed any sort of joint entity or association but, rather, have maintained their independent corporate identities and responsibilities for all purposes. The Director also persuasively notes that to read "group or combination acting as a unit" to permit combinations of corporations would be inconsistent with this Court's decisions recognizing the importance of separate corporate existence, even when two corporations act in concert and share a parent corporation. *See, e.g., Cent. Cooling & Supply Co. v. Dir. of Revenue, State of Mo., 648 S.W.2d 546, 549 (Mo. 1982)* (finding no basis to ignore separate corporate existence of subsidiary so subsidiary could avoid tax liability on transfers of goods between itself and parent).[9]

The retailers argue, however, that even if their credit card agreements with the banks would not otherwise fall within the definition of a "group or combination acting as a unit" under section 144.190.2, the Director has broadened the scope of the statute to include them in issuing 12 CSR 10-102.100. This argument is unavailing for two reasons. First, "[t]he rules or regulations of a state agency are invalid if they are beyond the scope of authority conferred upon the agency, or if they attempt to expand or modify statutes." *Union Elec. Co., 425 S.W.3d at 124-25*; *accord Hansen v. State, Dep't of Soc. Servs., Family Support Div., 226 S.W.3d 137, 143-44 (Mo. banc 2007)*. The Director's

---

[9] The retailers' attempt to distinguish *Central Cooling* on the basis that the subsidiary sought to avoid taxation rather than to obtain a refund is unpersuasive, as the intended

regulation cannot enlarge the meaning of the statute beyond its terms.

Second, the retailers are incorrect in construing 12 CSR 10-102.100 to apply to them. They rely primarily on the first subsection of the regulation, which states, "In general, a seller may file for a credit or refund within the three-year statute of limitations when sales are written off as bad debts." *12 CSR 10-102.100(1).* The retailers say that, because this sentence is written in the passive form and refers to "when sales are written off" without saying that it must be the seller who has written them off, they are entitled to seek refunds if a third party writes off the debt, even though they have written off nothing.

This interpretation of the regulation ignores its purpose, which is to allow a seller to receive a refund of sales tax paid if the sale on which it is based went bad and caused the seller to write off the debt. To allow a seller who has not suffered a loss to receive a refund would not serve this purpose. The logical fallacy of the retailers' interpretation is made clear when the sentence relied on is read in the context of the rest of 12 CSR 10-102.100, as it must be. *See Saint Charles Cnty. v. Dir. of Revenue, 407 S.W.3d 576, 578 (Mo. banc 2013)* ("When engaging in statutory construction, this Court recognizes that 'every word, clause, sentence, and provision of a statute must have effect'"). The regulation states, in full:

> (1) In general, a seller may file for a credit or refund within the three-year statute of limitations when sales are written off as bad debts.
> (2) Definition of Terms.
> > (A) Bad debt is a sale that has been written off for state or federal income tax purposes. In order to qualify for a bad debt deduction for

effect of the refund claim is substantially the same.

10

sales or use tax purposes, a sale must have been previously reported as taxable.

(B) Accrual or gross sales reporting method means a seller reports the sale and remits the tax at the time of the sale. The receipts are not received from the buyer until a later date. Therefore, a timing difference occurs between the time that the sale, with applicable sales tax, is reported to the state and the time that the seller receives payment from the buyer.

(3) Basic Application of the Law.

(A) A seller may file for a refund or credit within the three-year statute of limitations for those sales written off as bad debts if the sales were reported using the accrual or gross sales method. This period is calculated from the due date of the return or the date the tax was paid, whichever is later.

(B) If a bad debt credit or refund is given and the debt is later collected, that amount must be reported on the next return as a taxable sale.

*12 CSR 10-102.100.* Read together, subsections (2)(B) and (3)(A) make clear that the regulation applies only when the seller remits the sales tax at the time of sale but "[t]he receipts are not received from the buyer until a later date. Therefore, a *timing difference* occurs between the time that the sale, with applicable sales tax, is reported to the state and the time that the seller receives payment from the buyer." *12 CSR 10-102.100(2)(B)* (emphasis added).

Example A of the regulation further illustrates that its limited intended purpose is to allow a retailer who pays the full amount of sales tax up front to recover the portion of its *own* write-off losses remitted to the State when a buyer fails to pay fully:

A retailer reports and pays sales tax on the accrual or gross sales method. The retailer determines some sales to customers are not collectible and writes them off as bad debts for income tax purposes. The retailer requests a credit or refund from the state within the three-year statute of limitations. The credit or refund would be granted.

*12 CSR 10-102.100(4)(A).*

11

In the instant case, there was no timing difference between the time of sale and the time the retailers received full payment, including applicable sales tax. The retailers received those amounts immediately from the banks. The retailers sustained no losses in remitting the sales taxes to the state. The regulation simply does not apply.

Indeed, Circuit City's and Dillard's contrary interpretation would allow a party to be reimbursed fully for sales tax but at the same time to receive a refund of that very tax, thereby allowing a double recovery of the tax. While the retailers contend that they can avoid such double recovery through provisions in their agreements with the banks,[10] that is a matter of their specific contracts; the rules regarding who must pay the tax and who is entitled to a refund cannot vary depending on what extra-statutory contractual arrangements a particular retailer chooses to make with a bank. It is the retailer that is the seller,[11] and to get a refund the retailer itself must write off the debt.

While the specifics of the financing agreements between Dillard's and Circuit City

---

[10] Circuit City's private contract allowed it to keep 50 percent of any refunded sales taxes collected and to pass on the other 50 percent to the bank, even though it already had been reimbursed for the full sales tax amount by the bank at the time of the sale and retained those funds. Dillard's private agreement required it to pass on the whole amount of any refunded sales tax to the bank, minus Dillard's recovery costs, and also required shared profits to be set off by program losses, including bad debts, in certain circumstances. Under this arrangement, Dillard's profits may have been reduced as a result of bad debts written off by the bank, and its income tax liability reduced accordingly, but it still was reimbursed fully for sales tax by the bank at the time of sale. The Dillard's agreement appears to allow GE Capital, for its part, to recover the amount of the sales tax paid by Dillard's without losing the value of its write-off of that very tax as part of its bad debt.

[11] The retailers again argue that under the statutory definitions of "seller," *§ 144.010(12)* ("a person selling or furnishing tangible personal property or rendering services"), and "person," *§ 144.010(7)* ("any other group or combination acting as a unit"), they and their respective banks constitute a single seller for purposes for the refund claim. This argument is unavailing for the reasons set out above.

12

and their respective issuing banks vary, they have in common that they are private agreements between companies as to how they will share in profits, losses, or refunds. While these companies certainly are free to contract as they wish, they have not shown that their agreements are sufficient to make them a unit − whether through merger or joint venture or piercing of the corporate veil or by some other means coming within the definition set out in the statutes. As such, those private agreements do not affect the result here. A company's private agreements cannot modify the tax code or transform it into a joint enterprise for tax purposes.[12]

## IV.    CONCLUSION

The statute does not contemplate treating two separate corporations in a contractual relationship as a single tax entity for the limited purpose of obtaining a sales tax refund. The regulation relied on by the retailers to argue to the contrary cannot expand the statute and, by its terms, does not apply to retailers who do not incur bad debts because they have been fully reimbursed for the sales tax amounts they remitted to the state. The decision of the AHC is reversed, and the case is remanded.

_____

**LAURA DENVIR STITH, JUDGE**

All concur.

_____

[12] At oral argument, counsel for the retailers noted that the program agreements were entered into by sophisticated parties, taking into consideration factors such as the anticipated default rate. The parties likewise are free to, and already may, contract around anticipated sales tax losses. Indeed, the agreements also contemplate that their sharing of losses is subject to applicable laws, such as the statutes this Court applies here.