

# Missouri Court of Appeals

## Southern District

### Division Two

JANET DAILEY, CLINT SMITH,          )
SHARON K. JOBE and DONALD           )
W. INGRUM, CO-TRUSTEES of the       )
WILLIAM and JANET DAILEY            )
TRUST,                              )
                                    )
    Relators/Petitioners-Respondents,    )
                                    )
v.                                  )          No. SD32971
                                    )
BOARD OF ADJUSTMENT of the          )          **Filed:  Oct. 6, 2014**
CITY OF BRANSON, MISSOURI,          )
and the CITY OF BRANSON,            )
MISSOURI,                           )
                                    )
    Defendants/Respondents-             )
    Appellants.                          )


APPEAL FROM THE CIRCUIT COURT OF TANEY COUNTY

Honorable Mark E. Orr, Circuit Judge

## REVERSED AND REMANDED WITH DIRECTIONS

The Board of Adjustment of the city of Branson ("the Board") and the city of Branson ("City") appeal the judgment of the circuit court that:  (1) reversed the Board's decision to deny a sign permit ("the permit") sought by Janet Dailey, Clint Smith, Sharon K. Jobe and Donald W. Ingrum (as co-trustees of the William and Janet Dailey Trust ("the Trustees")); and (2) ordered City to issue the permit.

1

The permit would allow the Trustees to reconstruct a "grandfathered"[1] billboard ("the Billboard") that was struck by a tornado in February 2012. The Trustees submitted an application for the permit to City's Planning and Development Department ("the Department") in August 2012. The Department denied the permit on the ground that the Billboard had lost its status as a legal non-conforming sign.

Because we review the decision of the Board "rather than of the circuit court," the Trustees -- as the aggrieved party -- filed the appellant's brief as required by Rule 84.05(e).[2] *See* **Arens v. City of St. Louis**, 872 S.W.2d 631, 635 (Mo. App. E.D. 1994) ("[o]n appeal, we review the findings and conclusions of the [b]oard, rather than that of the trial court").

The Trustees first contend that City and the Board erred by "ignor[ing] the plain language of Chapter 70 of the Branson Municipal Code ["Code"] in that they arbitrarily created their own personal, subjective standard to govern the repair of damaged nonconforming signs." Second, the Trustees contend that the denial of the permit was "not based on competent and substantial evidence" because the Trustees "presented the only material and uncontroverted evidence that the [Billboard] could be repaired for less than [50%] of the replacement cost pursuant to [s]ection 70-17(a)(2) of the . . . Code."

Finding no merit in either point, we reverse the trial court's judgment and remand the matter for the entry of a judgment affirming the decision of the Board.

### Applicable Principles of Review and Governing Law

The scope of our review is limited to determining "'whether the Board's action is supported by competent and substantial evidence upon the whole record or whether it is

---

[1] We use here the common term for something that is "exempt . . . from new legislation, restrictions, or requirements[.]" DICTIONARY.COM, http://dictionary.reference.com/browse/grandfathered?s=t (last visited Sept. 30, 2014).
[2] All rule references are to Missouri Court Rules (2014).

arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction.'" *State ex rel. Teefey v. Bd. of Zoning Adjustment of Kansas City*, 24 S.W.3d 681, 684 (Mo. banc 2000) (quotation omitted). "Only where the board exceeds its authority should the reviewing court hold the board's ruling to be illegal and void." *Baumer v. City of Jennings*, 247 S.W.3d 105, 111 (Mo. App. E.D. 2008).

An applicant appealing the denial of a sign permit has "the burden of proof before the Board[.]" *Drury Displays, Inc. v. Bd. of Adjustment of City of St. Louis*, 832 S.W.2d 330, 331 (Mo. App. E.D. 1992) (applicant "omitted proof of an essential element of its case by failing to introduce the ordinance into evidence").

> It is the duty of the board of adjustment to find and determine the facts and in so doing to [weigh] the evidence presented to it. It may disregard and disbelieve evidence which in its judgment is not credible even though there is no countervailing evidence to dispute or contradict it.

*Veal v. Leimkuehler*, 249 S.W.2d 491, 496 (Mo. App. St.L.D. 1952).

"This Court reviews the correct interpretation of an ordinance *de novo* and applies the same rules that are used in interpreting a state statute." *Sunswept Props., LLC v. Ne. Pub. Sewer Dist.*, 298 S.W.3d 153, 159 (Mo. App. E.D. 2009).

### Facts and Procedural Background

*Pertinent Provisions of the Code*

A public hearing was held on the Trustees' appeal of the Department's denial of the permit by the Board on November 29, 2012.[3] At the hearing, a copy of the Code was received into evidence by the Board. Chapter 70 of the Code addresses "**SIGNS**[.]" Section 70-2 defines a "[*s*]*ign*" as "any device or structure designed to inform or attract the attention

---

[3] No one responded to an opportunity provided at the hearing for public comments. After the Board heard from witnesses, received exhibits, and provided an opportunity for public participation, "the public hearing" was closed. The Board, on the record, then had discussion among its members and received input from Mr. Ingrum, Mr. Lawson, and the attorney for City.

3

of persons who are not on the premises on which the device or structure is located."  Under the Code, a "[*s*]*ign, freestanding*, means a sign which is supported by one or more uprights, poles, or braces affixed to the ground, not attached to the principal building or structure."  A free-standing sign (in even the most permissive of the commercial "overlay zones" described in Code Chapter 70) is limited to "30 feet in height" and "300 square feet in sign area."  Sections 70-13(a)(1) & (2), (c)(1) & (2) and (c)(5)(a) & (b).  A "[*s*]*ign, off-premises*, means any sign relating to products, services, uses, or enterprises sold or offered at a location other than the premises where the sign is located."

The definition for "[*r*]*epair, renewal, refurbishment* and *restoration*" provides: "These words shall be synonymous and may be used interchangeably.  Their meaning is 'to restore to a former, better state, and resembling the original design and construction as closely as possible' when describing a damaged sign or a sign in disrepair."  A permit is required "for the construction, installation or repair of all signs" under Code section 70-6(5).  The permit provision also addresses "[*a*]*nchoring*[,]" and Code section 70-6(2)(b) states that "[a]ll freestanding . . . signs shall have self-supporting structures erected on and permanently attached to concrete foundations."  A provision incorporated into the Code in 1998, section 70-19, addresses "**Off-premises signs**" and provides:

(a)     [C]ity shall not issue any new permits for the construction of off-premises signs, except as otherwise provided in this chapter.

(b)     Nothing contained in this chapter shall be construed to limit the maintenance and repair of any existing off-premises signs.

Code section 70-17 addresses "**Nonconforming signs**" and provides:

(a)     *Legal nonconforming signs.*  Where a lawful sign exists at the effective date of adoption of the ordinance from which this chapter is derived (July 13, 1998) or amendment of this chapter that would be illegal under the terms of this chapter, such sign may be continued so

4

long as it remains otherwise lawful, subject to the following provisions:

    (1)    No such nonconforming sign may be enlarged or altered in any way which increases its nonconformity, but any sign or portion thereof may be altered to decrease its nonconformity.

    (2)    Should such nonconforming sign or nonconforming portion of sign be destroyed by any means to any extent of more than 50 percent of its replacement cost at the time of destruction, it shall not be reconstructed except in conformity with the provisions of this chapter.

    (3)    Should such sign be moved for any reason for any distance whatever, it shall thereafter conform to the regulations for the district in which it is located after it is moved. When a permit has been obtained, temporary removal of any portion of a sign for repairs and maintenance shall not be considered to be in violation of this stipulation. . . .

(b)    *Loss of legal nonconforming status.* A legal nonconforming sign shall lose this designation if:

    (1)    The sign is relocated or replaced; or

    (2)    The structure or size of the sign is altered in any way except towards compliance with this chapter. This does not refer to change of copy, graphics, or normal maintenance.

(c)    *Maintenance and repair of nonconforming signs.* The legal nonconforming sign is subject to all requirements of this Code regarding safety, maintenance and repair.

*The Permit Application*

A "Staff Report" approved by the Director of Planning and Development, Jim Lawson, Jr., was received into evidence as Exhibit 4. This exhibit incorporated still other exhibits, including the Trustees' "Sign Permit Application" ("the permit application") dated August 28, 2012. The permit application indicated that the work was to "REPAIR

5

EXISTING FREESTANDING SIGN" for "OFF-PREMISE ADVERTISING[.]" Drawings included with the permit application depicted the display portion of the Billboard as being 14 feet tall by 48 feet wide and affixed on top of a single "steel support column[.]" The Billboard had an overall height above grade of approximately 54 feet. Four "400 watt Halophane fixtures" were depicted on each side of the Billboard.

The permit application bore the following handwritten notation on the top of the first page: "Rec'd 8/28/12 sp 3p hand-delivered by Erick Walker[.]" At the bottom of the second page, the following hand-written notation appeared: "DENIED: DAMAGE TO BILLBOARD EXCEEDED 50% OF STRUCTURE. SINCE THIS WAS A LEGAL NON-CONFORMING SIGN, LEGAL NON-CONFORMING STATUS WAS LOST. K Crawford 8/30/12[.]"

*Other Evidence Presented by the Trustees*

The following testimony was provided by Mrs. Dailey on behalf of the Trustees. She and her late husband had owned the Billboard "since sometime in the early '80s." They conveyed the Billboard to the trust in 2003, and the Billboard produced lease revenue "probably in excess of $25,000 a year[.]" After "the [Billboard] was damaged in the tornado of February [2012]," the Trustees asked "Erick Walker of Native Sign to give . . . a price to reconstruct the [Billboard]." "[T]he original price that he gave . . . was [$]90,000[.]" Mrs. Dailey testified that "after Mr. Ingrum, our attorney for the [t]rust . . . informed us that we had to either repair or reconstruct it, or it couldn't go back up[,]" Mr. Walker was asked "to consult with an engineer to see if it was possible to still use the structure, both the foundation and the steel piling, and reconstruct the [Billboard] with that[.]"

6

Mr. Walker testified at the hearing that his first estimate was "to reconstruct the [Billboard] from start to finish" and the estimate was "somewhere around $90,000[.]" A March 2012 email from Mr. Walker to Mrs. Dailey included with the Staff Report provided that the "[p]rice, complete, installed" "to replace [the] existing [B]illboard destroyed by high winds" was $90,942. The various components of the bid were not priced separately, but the price included a "direct bury [foundation] complete with 3,000 PSI concrete footing approximately 12' square by 12' deep" and a 40' tall "Haggle" for the 14' tall sign. A price to "[r]emove existing steel column, horizontal support, and upper structure from location" was also provided which allowed a credit for "[s]crap value[.]"

Shortly after providing this estimate, Mr. Walker "remov[ed] debris and other components" from the site of the Billboard as it was "right between two existing businesses," and this "allow[ed] other things to happen on the properties." The "upright" for the Billboard was stored at Mr. Walker's shop. Mr. Walker testified that after Mr. Ingrum "came up with a plan to reconstruct or repair the [Billboard] after reviewing the ordinance, . . . we took that avenue and repriced the work to reconstruct or repair it[.]" Mr. Walker agreed that the precise cost was shown on the permit application. The "Estimated Value of the Project" was stated on the permit application as "42,500.00[.]" This amount was not itemized as to costs.

Mr. Walker consulted with an engineer about "the idea of a repair," and he understood from the engineer that the "steel column or the support column[,]" "[t]he horizontal column that sets on top of the main upright[,]" and the "twelve foot by twelve foot" foundation could be reused. According to Mr. Walker, the "[c]atwalk and the panel system, without some major modification, could probably not be used."

7

Patrick Crocker, the aforementioned engineer who consulted with Mr. Walker, testified that when he went to the site in July 2012, "there was no sign structure there. All that was remaining was the concrete block, the basic foundation." Mr. Crocker thought that the concrete base could be reused. He observed that "this was a baseplate construction that had anchor bolts to secure it to the concrete base." "Some of the bolts had been sheared off" and some of "them had popped loose" so "the basic assumption was they were not usable." He opined that the concrete base could be drilled for new bolts on "another baseplate" so as to "reestablish this sign structure on the original base[.]" Mr. Crocker had not inspected the former support column, but he understood from Mr. Walker that it matched or exceeded the specifications required for use according to Mr. Crocker's calculations.

One Board member inquired of "Don Ingrum" (who had been sworn as a witness), "Has there been another estimate on repairing [the Billboard]?" Mr. Ingrum replied, "No, there has not. We didn't feel that there was a necessity to . . . . In other words, [City] had the opportunity, if they wanted to get an estimate, to do so." The Board member stated that the lack of another estimate made "it difficult . . . to make a decision in this case."

Mr. Ingrum presented two letters from businesses "that have utilized the [Billboard] in the past and would like the ability to do so in the future." The letters were received as Exhibits 1 and 2.

*Evidence Presented on Behalf of the Department*

Mr. Lawson testified that "when the tornado came through" there was "a lot of damage to buildings and to signs, both on premise and off." Because employees of the Department were "not sign people" who were "familiar with the cost of the components of [a] sign[,]" Mr. Lawson established an internal policy that required them to "go out and look

8

at the signs." If a sign was gone, it was regarded as having "one hundred percent" damage, and he reasoned that "if one hundred percent of the sign [was] gone, then . . . one hundred percent of the cost is gone." If "the pole was still standing, quite a bit of it was still standing, and [they] got into a debate about 50, 40, 30 percent, then [the Department] was going to have to retain someone to begin to look at those components to determine cost." He did not regard "a piece of concrete in the ground" as "constitut[ing] a sign." Mr. Lawson agreed that Code section 70-17(a)(2) hinged on the cost to repair a sign versus its total replacement cost, but he thought that in cases like this where the sign is gone or no longer standing, then the analysis shifted to 70-17(b) (regarding impermissible replacement signs).

Keith Crawford testified that he was "the Code Enforcement Supervisor and sign reviewer for [City]. . . . going on three years." His background included work in a similar capacity for Taney County, a bachelor's "degree in electrical engineering[,]" and "certifi[cation] in property maintenance[.]" He went to the site of the Billboard on February 29, 2012, after the tornado had gone through. He "inspected the [Billboard] and the [Billboard] damage at that location[,]" and he took photographs which he referenced during his testimony as being "shown in Exhibits D.1 and D.2[.]" He "observed . . . the [Billboard] structure to be torn and separated from the footer with what [he] refer[red] to as the mangled remains of the [Billboard] lying on the ground towards [sic] the east." "[B]ased on [his] knowledge and experience and [his] observation, it was [his] opinion that [the Billboard] structure was totally destroyed."

After receiving the permit application on August 28, 2012, Mr. Crawford returned to the site of the Billboard that same day and "observed no sign structure, no remnants thereof at that location." He looked at the footer and saw that "what bolts were there, some were

9

bent, [and] some were . . . sheared off." He testified that his denial of the permit was shown on the permit application, but "in hindsight, that it would have been much clearer if [he] would have said that the [Billboard] was totally destroyed." Mr. Crawford had "no issue" with Mr. Crocker's calculations for the construction of a sign, but he regarded it as a proposal for replacement of the Billboard. Mr. Crawford testified that he had no opinion as to the reasonableness of the two cost figures -- $90,000 and $42,500 -- offered by the Trustees.

*The Board's Decision*

At the conclusion of the hearing, a motion before the Board to "deny the appeal of the [Department's] decision to not allow the nonconforming sign . . . to repair it, based on section 70-17" resulted in two "yes" votes, two "no" votes, and one abstention. Under Code section 425.040, the vote meant that the decision of the Department (to deny the permit) was upheld.[4]

"Findings of Fact" were approved by the Board "with a 4-0 vote and 1 abstention." The Findings of Fact included "Conclusions of Law" which stated, *inter alia*:

> 2.12 The requisite majority of the [Board] does not believe that the [Trustees] met the burden in showing that the [Billboard] in question meets the standards of [Code s]ection 70-17. It seems clear from the photographs in the staff report that the [Billboard] in question was totally destroyed. Even if some of the sign material could be reused, it would require substantial rebuilding in order to meet the requirements of [Code s]ection 70-17(2) [sic], that the [Billboard] be "reconstructed in conformity with the (building requirements) of this chapter." The one estimate provided by the [Trustees] based on their belief that much of the structure could be saved hovered nearly at the

---

[4] Section 425.040.3 of the Code provides, *inter alia*:

> The concurring vote of four members of the [B]oard shall be necessary to reverse any order, requirement, decisions, or determination of the administrative official, or to decide in favor of the applicant on any matter which it is required to pass under this title [appendix], or to effect any variation in the application of this title [appendix].

fifty (50) percent mark, and was not substantiated by an estimate from a contractor not employed to work in this matter.

2.13 Furthermore, [the] Code in section 70-17 states in ([b])(1) that a sign loses its legal non-conforming designation if it is relocated or replaced. It is clear from the testimony that the remains of the [Billboard] in question have been relocated from the area in which it stood, and a great deal of the [Billboard], to be safely placed directly adjacent to [City]'s main thoroughfare would need to be replaced, including, by [the Trustees'] witnesses' testimony, the sign portion of the [Billboard] itself, as opposed to the structure supporting the signboards.

This appeal timely followed the entry of the judgment by the circuit court that reversed the decision of the Board and ordered City to issue the permit.[5]

**Analysis**

For ease of analysis, we take up the Trustees' second point first.

*Point II – The Uncontroverted Evidence*

In its second point, the Trustees assert that the Board's denial of the permit was erroneous because the Trustees "presented the only material and uncontroverted evidence that the [Billboard] could be repaired for less than [50%] of the replacement cost[.]" The Trustees argue that under our standard of review, the Board's denial of the permit must be "supported by competent and substantial evidence[.]" *Teefey*, 24 S.W.3d at 684 (quotation omitted).[6] The Trustees further argue that because "$42,500 is *less than* [50%] of $90,942[,]" and there was no evidence rebutting that the Billboard could be safely repaired

---

[5] The Trustees also included a claim for monetary damages (Count II) in their petition before the circuit court based on the loss of rental income the Billboard would presumably have generated if City had allowed it to be reconstructed. The judgment does not include any reference to Count II of the Trust's petition. A docket entry entered the same date as the judgment states: "Count II of Plaintiff's Petition is dismissed without prejudice over Plaintiff's objection; Judgment entered." This means of disposition is not challenged on appeal.

[6] In *Teefey*, a city had the burden of proving that the landowners at issue had violated the city's zoning ordinance by operating a sanitary landfill in a district not zoned for such use. *Id* at 682-83. Here, counsel for the Trustees admitted at oral argument that the Trustees had the burden of proving that they were entitled to the permit, and counsel does not explain why a decision against the Trustees (as the party with the burden of proof) needed any evidence supporting it. *See White v. Director of Revenue*, 321 S.W.3d 298, 305 (Mo. banc 2010) (a decision against the party with the burden of proof needs no evidence supporting it).

11

for the lower figure -- especially since Mr. Crawford had "no issue" with Mr. Crocker's engineering calculations[7] -- then the permit "should have been approved."

In their brief, City and the Board admit that the Trustees' "evidence of replacement cost" was uncontroverted, but they argue that the Trustees failed to satisfy their burden of proving that they were entitled to the permit. Assuming, without deciding, that the Board was required to credit the cost of repair and cost of replacement figures provided by the Trustees, we agree that the Trustees failed to satisfy their burden of proof because the evidence they presented was insufficient to allow the Board to find that the cost of repairing the Billboard did not exceed 50% of the cost to replace its non-conforming portions.

It is undisputed that $42,500 is less than 50% of $90,942. But, even if the Board was obligated to accept the non-itemized figure of $42,500 as the cost to repair the Billboard, it could not have used the $90,942 figure provided by the Trustees as the replacement cost figure specified in Code section 70-17(a)(2).

Code section 70-17(a)(2) provides, "Should such nonconforming sign or *nonconforming portion of sign* be destroyed by any means to any extent of more than 50 percent of *its* replacement cost at the time of destruction, *it* shall not be reconstructed except in conformity with the provisions of this chapter." (Emphasis added). This language indicates that a sign may be either entirely non-conforming or only partially non-conforming. Here, the evidence indicated that the Billboard was only partially non-conforming -- that the Billboard was non-conforming because of the content of its advertising (it was an "off-premises" sign), and it was too tall with an advertising area too large for even a free-standing sign located in a commercial overlay zone. In contrast to that

---

[7] We note that Mr. Crawford neither agreed that the Billboard could be repaired for $42,500 nor stated that the cost to replace it was $90,942. He simply had no opinion as to the reasonableness of those figures.

evidence, none of the evidence before the Board indicated that the existing foundation of the Billboard was not in conformance with the Code, and the Trustees argue in their reply brief that the foundation is a part of the Billboard under the definition of "sign" as set forth in Code section 70-2.

Assuming as true the Trustees' assertion that the concrete foundation is a part of the Billboard, the cost associated with the installation of a new foundation could not properly be included in the replacement-cost portion of the applicable cost-of-repair to cost-of-replacement ratio as the existing foundation was not a "nonconforming portion of [a] sign[.]" Code section 70-17(a)(2). The $90,942 figure provided by the Trustees included an unspecified cost for a "direct bury [foundation] complete with 3,000 PSI concrete footing approximately 12' square by 12' deep[.]" Without an itemized figure to subtract out of the total replacement cost estimate for that non-applicable portion, the Board could not determine that the cost of repair was no greater than 50% of the cost of replacement.

Because the Trustees failed to prove that the cost of repairing the Billboard was not more than 50% of the cost to replace its non-conforming portions, they have failed to show that the Board's decision was "arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction." *Teefey*, 24 S.W.3d at 684. Point II is denied.

*Point I – Whether the Board Ignored Code Chapter 70*

The Trustees' first point contends that City and the Board "ignored the plain language of [the Code] in that they arbitrarily created their own personal, subjective standard to govern the repair of damaged nonconforming signs." The point does not specify the offending standard, but in the argument that follows the point, the Trustees assert that "[t]he Department and the Board misinterpreted [Code s]ection 70-17(a)(2) to mean that if

13

more than [50%] of the *actual physical structure* of a sign is destroyed, then it could not be repaired." We therefore presume that this represents the Trustees' complaint.

In support of the proposition that the Board adopted this misconstruction of Code section 70-17(a)(2), the Trustees point to the combination of the testimony of Mr. Lawson regarding the internal policy for signs that appeared to have damage to "50 percent or more . . . to the structure[,]" the denial language used by Mr. Crawford on the permit that "DAMAGE TO BILLBOARD EXCEEDED 50% OF STRUCTURE[,]" and the Board's findings "that the [Billboard] in question was totally destroyed" and "substantial rebuilding" would be necessary to satisfy Code section 70-17.

Simply because Mr. Crawford gave "DAMAGE TO BILLBOARD EXCEEDED 50% OF STRUCTURE" as the basis for the Department's denial of the permit did not mean that the Board must have interpreted Code section 70-17(a)(2) as addressing the percentage of damage to the physical structure of the sign itself instead of the percentage of replacement cost involved to repair a sign. Additionally, Mr. Lawson did not disregard the role of cost in determining whether a sign could be repaired. Mr. Lawson testified that his process of inspecting signs to determine whether there was "50 percent or more damage to the structure" was his "beginning point."

It is true that the Board found that "the [Billboard] . . . was totally destroyed" and that "[e]ven if some of the sign material could be reused, it would require substantial rebuilding in order to meet the requirements of [Code s]ection 70-17(2) [sic.]" But the Board did not find that the permit should be denied simply because over 50 percent of the Billboard had been destroyed. Instead, the language relied on by the Trustees followed the Board's finding at the beginning of the relevant paragraph that "[t]he requisite majority of

14

the [Board did] not believe that the [Trustees] met the burden in showing that the [Billboard] in question meets the standards of [s]ection 70-17."

The language cited by the Trustees was also followed by the Board's further findings that "[t]he one estimate provided by the [Trustees] based on their belief that much of the structure could be saved hovered nearly at the fifty (50) percent mark, and was not substantiated by an estimate from a contractor not employed to work in this matter."  This supported the Board's conclusion that a "substantial rebuilding" cost would be involved "[e]ven if some of the sign material could be reused[.]"  The decision of the Board rejecting the cost estimate provided by the Trustees as accurately reflecting the applicable rebuilding cost was consistent with the requirements of the plain language of Code section 70-17(a)(2).

Point I is also denied, and the judgment of the circuit court is reversed.  The matter is remanded to the circuit court, and it is directed to enter a judgment affirming the Board's denial of the permit.

DON E. BURRELL, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS

15