

# In the
# Missouri Court of Appeals
## Western District

FOUR B. CORP. AND
HARRISONVILLE MARKETPLACE
II, LLC,

           Appellants,

v.

CITY OF HARRISONVILLE,
MISSOURI BOARD OF ZONING
ADJUSTMENTS,

           Respondent.

WD85325
Consolidated with
WD85332 and
WD85421
OPINION FILED:
April 18, 2023

**Appeal from the Circuit Court of Cass County, Missouri**
The Honorable R. Michael Wagner, Judge

Before Division Three:  Janet Sutton, Presiding Judge, Cynthia L. Martin, Judge, and
Edward R. Ardini, Jr., Judge

Four B Corporation ("Four B") and Harrisonville Marketplace II, LLC

("Marketplace") (collectively, "Appellants") appeal from the trial court's judgment

denying their Petition for Writ of Certiorari which requested that the trial court reverse

the City of Harrisonville's Board of Zoning Adjustments' ("BZA") decision denying

Appellants' application for a building permit to construct a natural gas generator. Finding no error, we affirm.

## Factual and Procedural Background[1]

Marketplace owns the building and land located at 520 South Commercial in Harrisonville, Missouri. Four B leases the land and building from Marketplace, and owns and operates a Price Chopper grocery store in the leased building. Marketplace and Four B have common ownership. The land where the Price Chopper is located is zoned CP-2, which is a planned zoning district counterpart to a C-2 zoning district in the city of Harrisonville ("City"). CP-2 and C-2 zoning districts are commercial service business districts under the City's code of ordinances ("City code"). CP-2 and C-2 zoning districts are bound by the same regulations and standards, set forth in Article XV of the City code.

On May 18, 2019, Micro-Grid No. 37, LLC and MGES, LLC (collectively, "MGES") applied for a building permit with the City to construct a natural gas-powered generator on the land where the Price Chopper is located. MGES is an electrical supplier company that installs natural gas generators. The proposed generator would have self-generated all of the electricity required to operate the Price Chopper.

From May, 2019 to February, 2021, MGES, Appellants, the City, and the Missouri Public Utility Alliance ("MPUA"), the City's electricity provider, engaged in discussions about MGES's permit application. The City identified several issues with the permit

---

[1]We "view the evidence and reasonable inferences therefrom in a light most favorable to the [BZA's] decision." *Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kansas City*, 543 S.W.3d 28, 34 (Mo. banc 2018) (quoting *State ex rel. Teefey v. Bd. of Zoning Adjustment of Kansas City*, 24 S.W.3d 681, 684 (Mo. banc 2000)).

application, including: (1) a CP-2 zoning district does not allow for self-generation of electricity through the construction of a privately owned, on-site generator; (2) varying sets of proposed construction plans had been submitted, none of which were final; (3) the proposed generator threatened the City's contract with MPUA and violated the City's statutory right to supply electricity to the site pursuant to section 91.025(2); and (4) it was unclear whether MGES or Four B was the actual applicant for the building permit, and that in any event, neither had demonstrated ownership of the site or approval from the owner of the site. No building permit was ever issued by the City in response to MGES's application.

On April 9, 2021, a new building permit application ("the Application") was submitted to the City. On the Application, Appellants were listed as the "Owner," while MGES was listed as the "Contractor." The Application requested a building permit to construct a "400kW Natural Gas Generator/Absorption chiller/cooling tower/battery" on the site, outside of the Price Chopper building. On April 23, 2021, Appellants sent a letter to the City in an attempt to address issues previously raised by the City. Appellants attached a bill of sale documenting that on March 30, 2021, Four B purchased the generator it hoped to install, along with its container, parts, supplies, and software, from MGES.

On May 27, 2021, the City responded to Appellants' letter. The letter acknowledged that several issues existed with the Application, but focused on the zoning issue the City deemed dispositive. The City advised Appellants that the Price Chopper site is not zoned for an electrical generation facility designed to supply all of the

3

electricity for the site, and that the City therefore could not issue a building permit because the construction contemplated by the Application was not authorized by the City code. The City suggested two alternative options to Appellants: (1) seek rezoning or a special use permit by application to the Planning and Zoning Commission and Board of Aldermen, or (2) participate in a review of the City's code during a six-month moratorium on the issuance of construction permits for electrical generation facilities. In connection with the second option, the City advised that they did not agree with Appellants' contention that the construction proposed by the Application was an authorized accessory use because it was "incidental" to the operation of a grocery store. The City invited Appellants to provide evidence of any other grocery store that had primary, privately owned, on-site generation facilities that are completely "off grid" from the City's electrical power supply.

In response, Appellants advised that they were not interested in either option, and that they would not seek rezoning of the site or a special use permit for construction of the generator because they believed the City code authorized the generator on the site as currently zoned. The City advised Appellants that a building permit would not be issued, and invited Appellants to take their Application to the BZA. On June 24, 2021, Appellants filed an appeal from the City's denial of its Application with the BZA ("BZA Appeal"), asserting that the City had not properly applied its zoning regulations in refusing to issue the requested building permit.

The BZA Appeal was heard on August 10, 2021. City staff provided the BZA with a report summarizing the history of the building permit applications for the proposed

4

generator, and the issues that had been raised by the City. Attached to the report were measurements and pictures of the proposed generator and chilling and cooling tower, which established that the equipment that would be installed pursuant to the Application would consist of a 400kW natural gas generator approximately 30 feet x 10 feet in size and a 100-ton chiller and cooling tower approximately 6 feet x 10 feet in size, located behind the Price Chopper building.

The report concluded that "the City believes that a reasonable interpretation of the Zoning Code is that [] privately-owned power generating units providing 100 percent of the electricity for a building on a 24/7, 365 days a year basis are a 'Private Utility Facility' and appropriately allowed as permitted uses in the M-1 and M-2 industrial zoning districts and not allowed in any commercial zoning district, including the CP-2 zoning district in which Price Chopper is located." The report also concluded that, "Noise is a major issue with primary power generation. To use the proposed 400kW generator as an example, the airborne weighted average at all frequencies is 113 decibels []. Placing this generator inside a sound attenuation box, such as is proposed at Price Chopper, the projected noise is 55 decibels." The report cited section 405.320 of the City code which identifies the "Performance Standards" in a CP-2 zoning district: "No noise . . . shall be produced that is perceptible outside a building . . . ." The report went on to explain in contrast that although the City permits the installation of standby (backup) generators even though they exceed Performance Standards, they do so because backup generators are "accessory uses that operate intermittently due to [the] failure of primary grid power sources." The report also explained that although solar panels are permitted by the City

5

in all zoning districts as accessory uses, they do not emit noise in violation of Performance Standards.

During the BZA hearing, Appellants and the City each presented arguments and testimony. Appellants predominantly asserted that the proposed generator was a permitted accessory use under the City code. The City opposed that interpretation of the code, and argued that the proposed generator does not qualify as an accessory use because it is not customarily and commonly associated with the main permitted use on the site as required by section 405.550 of the City code. At the end of a two-hour hearing, the BZA voted unanimously to deny the BZA Appeal.

Appellants timely filed a Verified Petition for Writ of Certiorari pursuant to section 89.110[2] ("Writ") in the Circuit Court of Cass County, Missouri, requesting the circuit court to review and reverse the BZA's denial of the BZA Appeal. The circuit court reviewed the record before it, including arguments of counsel, before it issued a judgment denying the Writ on May 6, 2022 ("Judgment").

This appeal follows.[3]

**Standard of Review**

We review "the findings and conclusions of the BZA and not the judgment of the trial court." *State ex rel. Vandenboom v. Bd of Zoning Adjustment of City of Kansas City,*

_____

[2]All statutory references are to RSMo 2016 as supplemented through the date Appellants filed the Writ petition, unless otherwise noted.

[3]Three notices of appeal were filed before this Court received a final, appealable judgment as required under Rule 74.01. This Court sustained Appellants' and the BZA's joint motion to consolidate the appeals.

6

633 S.W.3d 446, 455 (Mo. App. W.D. 2021) (quoting *Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kansas City*, 543 S.W.3d 28, 33 (Mo. banc 2018)). Article V, section 18 of the Missouri Constitution governs the scope of our review, and provides that judicial review of an agency decision "shall include the determination whether the [decision is] authorized by law, and in cases in which a hearing is required by law, whether the [decision is] supported by competent and substantial evidence upon the whole record." *Antioch Cmty. Church*, 543 S.W.3d at 33-34 (quoting Mo. Const. art. V, section 18).

Whether the BZA's decision is authorized by law is a legal question that we determine *de novo*. *Antioch Cmty. Church*, 543 S.W.3d at 34 (citing *State ex rel. Teefey v. Bd. of Zoning Adjustment of Kansas City*, 24 S.W.3d 681, 684 (Mo. banc 2000)). "Determining whether the decision is supported by competent and substantial evidence 'does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal.'" *Id.* (quoting *Mann v. Mann*, 239 S.W.2d 543, 544 (Mo. App. 1951)). Rather, "an appellate court must view the evidence and reasonable inferences therefrom in a light most favorable to the decision." *Id.* (quoting *Teefey*, 24 S.W.3d at 684). "An applicant appealing the denial of a [] permit has 'the burden of proof before the Board[.]'" *Dailey v. Bd. of Adjustment*, 455 S.W.3d 97, 99 (Mo. App. S.D. 2014) (quoting *Drury Displays, Inc. v. Bd. of Adjustment of City of St. Louis,* 832 S.W.2d 330, 331 (Mo. App. E.D. 1992)).

**Analysis**

Appellants raise five points on appeal. The first four points challenge the BZA's interpretation of the City code, while the fifth point argues that the BZA's decision was not supported by competent and substantial evidence. We address the points on appeal out of order. The logical starting point is to first determine whether the BZA correctly applied the City code when it denied the BZA Appeal because the construction contemplated by the Application is not permitted as an accessory use in a CP-2 zoning district, the subject of Appellants' second point on appeal.

*Point Two*

In their second point on appeal, Appellants argue that the BZA erred in denying the BZA Appeal because the BZA improperly interpreted and applied the City code when it determined that the generator contemplated by the Application is not an accessory use that is authorized in a CP-2 zoning district.

We interpret city "ordinances using the same general rules of construction as are applicable to the statutes of the state." *Vandenboom*, 633 S.W.3d at 456 (quoting *Antioch Cmty. Church*, 543 S.W.3d at 35). The "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Id.* (quoting *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009)). We resort "to other rules of statutory interpretation only when the plain meaning of the statute is ambiguous or defeats the purpose of the statute." *Id.* (quoting *Karney v. Dep't of Lab. & Indus. Rels.*, 599 S.W.3d 157, 162 (Mo. banc 2020)). "When interpreting

8

a statute, no portion of it is read in isolation, but rather is read in context to the entire statute, harmonizing all provisions." *Id.* (quoting *Antioch Cmty. Church*, 543 S.W.3d at 35).

Sections 405.315 through 405.335 of the City code pertain to zoning districts C-2 and CP-2. Section 405.315(A) identifies the "Permitted Uses" in zoning district CP-2: "no building, structure, land or premises shall be used and no building or structure shall be hereafter erected, constructed, reconstructed, moved or altered except for one (1) or more of the following uses . . . [.]" Section 405.315(A) lists various types of businesses permitted in zoning district CP-2, including retail stores, nurseries, bakeries, and services such as auto repair and washing and pet grooming. There is no issue in this case that the Price Chopper grocery store is a permitted use in a CP-2 zoning district. Section 405.315(A) continues, and also authorizes "[a]ccessory uses ***customarily incident to the normal operation*** of the above [permitted] uses, including parking lots and signs as provided in this Chapter." (Emphasis added).

Accessory uses are also addressed in the City code in Article XX, titled "Supplementary Regulations." Article XX is applicable to all zoning districts. Section 405.550 of that article provides:

Accessory Uses.

General Regulations. Buildings and structures may be erected and land may be used for purposes which are ***clearly incidental to and customarily and commonly associated with the main permitted use of the premises***. A use or structure shall be considered an accessory when it is associated in conjunction with the principal use and is incidental and integrally related to the principal use. Such accessory buildings and uses shall be so constructed, maintained and conducted as to not produce noise, vibration,

9

concussion, dust, dirt, fly ash, odor, noxious gases, and heat or glare which is injurious, unhealthful or disturbing to adjacent property or the users thereof and shall be on the premises of the main use. . . .

(Emphasis added). Section 405.550 then identifies specific uses that "shall be permitted as accessory to main uses in this Chapter" in subsections dedicated to discussing each zoning district identified in the City code.

Appellants do not contest that both section 405.315(A) and section 405.550 apply to their Application. The standard for an authorized accessory use in C-2 and CP-2 zoning districts set forth in section 405.315(A) ("accessory uses customarily incident to the normal operation" of a permitted use) is plainly subsumed in the more restrictive standard applicable to authorized accessory uses in all zoning districts set forth in section 405.550 ("purposes which are clearly incidental to and customarily and commonly associated with the main permitted use of the premises," and that are "incidental and integrally related to the principal use"). The City contended when it denied the Application, and in the report presented to the BZA, that the generator contemplated by Appellants' Application failed to qualify as an accessory use under section 405.550 of the City code.

Appellants disagree with this interpretation of the City code. They argue that "power generation is customarily and commonly 'associated in conjunction with'" grocery store operations because "power is regularly, and customarily generated to facilitate commercial sales to customers." While electricity usage is clearly incidental to and customarily and commonly associated with a grocery store operation (the permitted use on the property), nothing in the record before the BZA supports the conclusion that self-

10

generation of all electricity required to operate a grocery store with a privately-owned natural gas generator located on-site is clearly incidental to and customarily and commonly associated with the operation of a grocery store. In fact, Mitch Waldberg, an MGES representative, testified at the BZA hearing that the Application, if granted, would "put Harrisonville on the forefront of energy efficiency and a renewable and technology use versus trying to take things back . . . and Harrisonville was a good site, a good location for this, and it will be showcased in the Midwest especially, if not the United States." And the City's attorney argued before the BZA that no other grocery stores in Harrisonville are "off grid" by virtue of the self-generation of electric power through the use of privately-owned generators located on site. The BZA did not commit legal error by denying the BZA Appeal because pursuant to the City code, the generator proposed by the Appellants' Application is not an authorized accessory use for the permitted use of a grocery store.

This conclusion is bolstered by the fact that section 405.550(J) identifies permitted accessory uses in CP-2 and C-2 zoning districts that shall be authorized as follows: "Parking areas, signs as permitted by ordinance, flood lighting and other similar uses." Appellants' argue that this list of accessory uses in a CP-2 zoning district is not exhaustive. We agree, and find no basis in the record as a whole to conclude that the City has ever argued to the contrary. However, it is nonetheless instructive that although section 405.550(J) expressly authorizes "other similar uses" in addition to the accessory uses specifically identified in the section, pursuant to "a fundamental tenant of statutory construction, *ejusdem generis*, . . . where general words follow specific words, the

11

general are construed to include only objects similar in nature to those enumerated specifically." *State v. William*, 100 S.W.3d 828, 833 (Mo. App. W.D. 2003) (citing *State v. Lancaster*, 506 S.W.2d 403, 405 (Mo. 1974); *Vocational Servs., Inc. v. Developmental Disabilities Res. Bd.*, 5 S.W.3d 625, 630-31 (Mo. App. W.D. 1999)). Applying the doctrine of *ejusdem generis*, "context is important 'in determining the scope and extent of more general words.'" *Circuit City Stores, Inc. v. Dir. of Revenue*, 438 S.W.3d 397, 401 (Mo. banc 2014) (quoting *Standard Operations, Inc. v. Montague*, 758 S.W.2d 442, 444 (Mo. banc 1988)). Though Appellants correctly argue that the list of authorized accessory uses in section 405.550(J) is not exhaustive, they have not argued (nor could they have effectively done so) that a 400kW natural gas powered cogeneration unit, measuring thirty feet by ten feet, along with a 100-ton chiller and cooling tower measuring ten feet by six feet, designed to generate and supply 100 percent of the electricity required to operate a grocery store is an accessory use that is similar in nature to a parking lot, flood lights, or signage for a grocery store. Appellants have not sustained their burden to establish that the generator proposed by their Application is an authorized accessory use under the City code.

It is instructive, if not controlling, in reaching this conclusion, that where the City code intends to authorize power generators as either a permitted use or an authorized accessory use in a zoning district, it has expressly done so. For example, section 405.550(H), which applies to R-3 and R-4 zoning districts ("cluster or garden type residential districts," and "medium density apartment districts"), expressly identifies "power generators" as a permitted accessory use. And section 405.485 addressing

12

permitted uses in zoning district M-1 ("light industrial district") expressly authorizes "public and private utility facilities," while section 405.505 addressing permitted uses in zoning district M-2 ("general industrial district") expressly authorizes any use permitted in zoning district M-1.

Appellants urge in the argument portion of their Brief that the City has conceded that the generator contemplated by their Application is an authorized accessory use because it has otherwise approved as accessory uses: self-power generation through the use of a diesel generator for Cass County Regional Medical Center which sits on land zoned CP-2; solar panels in all zoning districts; and power generators in some residential districts. Appellants' argument is not stated in or fairly contemplated by their second point relied on and thus preserves nothing for our review. *KDW Staffing, LLC, v. Grove Constr., LLC*, 584 S.W.3d 833, 837 (Mo. App. W.D. 2019) (holding that the requirements of Rule 84.04(d)(1) addressing points relied on necessitate the conclusion that the only issues or claims of error preserved for appellate review are those stated in a point relied on). In any event, we are not persuaded by Appellants' argument. Approval of power generators in zoning districts R-3 and R-4 is expressly authorized by section 405.550(H), as we have already explained. Cass County Regional Medical Center is a quasi-governmental body that is subject to state regulations. The Cass County Regional Medical Center diesel generator is not a primary power generator, and is instead a back-up generator, required by Missouri regulations as "an emergency source of electricity" large enough to "supply all lighting and power load demands" of the hospital in the event the hospital cannot draw sufficient power from the public utility grid. *See* 19 CSR 30-

13

22.010(1)(H)10-12.  And though the City has apparently approved as accessory uses back-up generators in other residential districts, and solar panels in all zoning districts, it does not follow that by doing so the City has conceded that every application for self-generation of power qualifies as an accessory use under section 405.550 of the City code. As the City notes, none of these approved accessory uses are primary or exclusive power sources, and instead all are supplemental or back-up power sources.  And, in each case other laws, regulations, or provisions of the City code may be relevant to supporting the City's construction of whether the supplemental or back-up power source should be deemed to be an authorized accessory use.[4]

Even if we concluded that Appellants have met their burden to establish that the generator proposed by their Application is an authorized accessory use under the City code (which we do not not), Appellants would not be able to overcome the City code's hurdle to approving accessory uses that generate noise.  As noted, section 405.550(A)

---

[4] For example, solar panels are incentivized renewable energy sources, calling into question the extent to which the City code must be applied consistent with other applicable laws.  And, section 405.551 of the City code addresses Accessory Public Utility Uses and Facilities in all zoning districts and contemplates that "accessory utility facilities" up to a certain size "may be installed above ground with the prior approval of the City" in residential and non-residential districts.  Section 405.551(A)(3)(4). "Accessory utility facilities" that exceed the stated sizes in these sections require a special use permit.  *Id.*  Though section 405.551 of the City code applies by its terms to "public utilities," it defines "accessory utility facilities" to mean "such facilities, including pedestals, boxes, vaults, cabinets or other ground-mounted or below ground facilities, that directly serve the property or local area in which the facility is placed, are not primarily for transmission or distribution to other locations, do not materially alter the character of the neighborhood or area and otherwise are customarily found in such areas." Section 405.551(A).  We need not decide whether the approval of residential back-up generators as accessory uses is required or influenced by section 405.551, but simply note that the section may have some bearing on the subject.

requires that "accessory buildings and uses shall be so constructed, maintained and conducted as to not produce noise . . . which is injurious, unhealthful or disturbing to adjacent property or the users thereof[.]" In addition, Performance Standards regulating noise are set forth in section 405.320(C), applicable to all permitted uses in CP-2 and C-2 zoning districts. Section 405.320(C) explicitly states, "[n]o noise . . . shall be produced that is perceptible outside a building . . . ." These performance standards authorize the City to deny a permit application even though the contemplated use would otherwise be an authorized permitted or accessory use. During the BZA hearing, Appellants acknowledged that their proposed generator would emit 113 decibels, though they argued that by placing the generator inside of a sound attenuation box, the generator would only emit fifty-five decibels. Though Appellants argue that "55 decibels is not very loud," they nonetheless concede that their proposed generator would produce noise that is perceptible outside of the building it would be contained within, in violation of the Performance Standards for the CP-2 zoning district, and in violation of the noise restrictions set forth in section 405.550(A). And, as the City argued, the persistent and constant operation of the generator contemplated by the Application, which would necessarily operate at all times to produce all of the electric power needed to operate the Price Chopper, is markedly distinguishable from emergency back-up generators that only operate in the event of and during a primary power failure, and solar panels that produce no noise, insofar as the injurious and disturbing effect on adjacent properties.

15

Appellants have failed to sustain their burden to demonstrate that the generator proposed in their Application is an authorized accessory use under the City code. The BZA's denial of the BZA Appeal is not erroneous.

Point Two is denied.

## *Point Five*

In their fifth point on appeal, Appellants argue that the BZA erred in denying the BZA Appeal because the BZA's denial was not supported by competent and substantial evidence on the record. Specifically, Appellants argue that the BZA's decisions that the proposed generator would violate section 405.320(C)'s noise Performance Standards, that the proposed generator would be dangerous to Harrisonville citizens in violation of section 405.550(A)'s performance standards, and that the Application "morphed" or "shifted" between the date it was filed and the date of the BZA hearing, are not supported by competent and substantial evidence.

We have already explained in our discussion of Appellants' second point on appeal that the generator contemplated by the Application does not fall within the definition of an accessory use under the City code, without regard to performance or other standards. As a result, the arguments advanced in Appellants' fifth point on appeal are rendered moot, as each argument necessarily presupposes that the Application proposed an accessory use as defined by the City code, but was nonetheless erroneously denied based on a performance standard for permitted uses, or some other "procedural" malady.

Point Five is denied.

16

*Point Three*

Appellants' third point on appeal argues that the BZA erroneously denied Appellants' BZA Appeal "on subjective, discretionary considerations that the building permit 'would be a detriment' to the City" because the BZA had a ministerial duty to issue the permit without discretion. Appellants assert that BZA member Michelle Hart ("Hart") "made clear that she voted to deny [the Application], in part, because she 'think[s] it would be a detriment to the City and to the zoning that is in place for other companies in the C-2 zoning.'"

Appellants rely on *Wolfner v. Bd. of Adjustment of City of Frontenac*, 672 S.W.2d 147, 150 (Mo. App. E.D. 1984), which held that "[t]he issuance of a building permit is a ministerial act which the building commissioner may not legally refuse to ***perform if the requirements of the ordinance have been met.*** (Emphasis added) (citing *State ex rel. Folkers v. Welsch,* 124 S.W.2d 636, 639 (Mo. App. 1939)). *Wolfner* is of no aid to Appellants. The City code defines "permitted use" as "a use by right which is specifically authorized in a particular zoning district." Section 405.030(B). And, section 405.040(E) defines the "Prohibited Use of Land or Buildings" by providing that "[n]o building or tract of land shall be devoted to any use other than one which is specified as a permitted use, accessory use or an approved special use[.]" Section 405.040(E). Appellants do not argue that the generator proposed by their Application is among the permitted uses in a CP-2 zoning district listed under section 405.315(A), and plainly it is not. Appellants declined the City's suggestion to seek a special use permit for the generator, requiring the conclusion that the generator is not an approved special use. And we have already

17

explained that Appellants' proposed generator does not qualify as an accessory use in a CP-2 zoning district. It necessarily follows, therefore, that the generator proposed in the Application is a "prohibited use of land or buildings" under the City code. The City does not have a ministerial duty to issue a building permit for a use that does not comply with the City code. Comments by a BZA member about other matters of concern are superfluous and irrelevant to establishing whether the BZA had a ministerial duty to approve Appellants' Application.

Point Three is denied.

***Point One***

Appellants' first point on appeal contends that the BZA erred in denying the BZA Appeal because once the City Administrator denied the Application, Appellants were entitled to appeal to the BZA pursuant to section 405.575 of the City code, and the BZA erroneously found that Appellants could not pursue the BZA Appeal without first applying to the Planning and Zoning Commission for rezoning of the site. This point on appeal is plainly without merit.

Section 405.575 of the City code provides:

> The City Administrator . . . shall be empowered to act within the provisions of this Chapter upon all applications for permits. In the event or refusal to issue a permit upon an application as herein provided, the applicant shall have the right to appeal to the [BZA] as set forth in this Chapter.

Pursuant to this code provision, Appellants had the right to appeal the City's denial of their Application to the BZA. Consistent with section 405.575 of the City code, the City's attorney advised the BZA during the hearing:

18

> [Appellants] submitted a building application, which the City said it will not issue because it does not comply with the zoning ordinance. The zoning ordinance states that if the applicant wishes to appeal a City's decision to not issue the building permit, the appeal comes to you, the zoning board, which is why we're here tonight.

As required by section 405.575, the BZA considered the merits of the City's denial of the Application, as evidenced by the arguments and evidence presented during the two-hour BZA hearing.

Appellants nonetheless argue that the BZA "made findings that [Appellants] were not entitled to a building permit without first seeking rezoning," and thus indirectly made a finding that Appellants had no right to appeal to the BZA from the denial of their Application. Appellants point to a statement made by April McLaughlin ("McLaughlin"), a member of the BZA, at the conclusion of the hearing:

> I move to deny the appeal. . . . For the reason that I believe that their definition of private utilities under the M-1 [sic]. First, M-1 does not apply under the current zoning codes that Price Chopper is currently under, and I was not convinced that it was improperly applied by the City officials at this time. And, I believe that this is the incorrect forum in which to remedy that if in fact it is incorrect, and for that reason I move to deny the appeal.

McLaughlin's somewhat convoluted comment does not reflect a finding that Appellants had no right to appeal the City's denial of their Application without first seeking to rezone their site. Instead the comment at best reflects one BZA member's view that had Appellants followed the City's suggestion to seek to rezone their property to M-1 (where private utility facilities are expressly authorized as a permitted use), Appellants' might have stood a better chance of securing approval of the proposed generator. Appellants have not demonstrated that the BZA erroneously denied the BZA

19

Appeal based on a finding that Appellants were not entitled to file the BZA Appeal after the City denied their Application without first seeking rezoning.

Point One is denied.

## *Point Four*

Appellants' fourth point on appeal asserts that the BZA erred in denying the BZA Appeal because the BZA "relied on the City's arguments contesting the consideration which Four B provided to acquire the power generation equipment assigned by [MGES.]" Appellants take issue with the City's argument before the BZA that Four B did not demonstrate that it paid sufficient consideration to MGES for the generator, calling into question whether the bill of sale for the generator was a "sham" to conceal that MGES was the true applicant for the building permit.

Appellants' point on appeal is without merit. The BZA never mentioned MGES or the sale of the generator in its oral pronouncement denying the BZA Appeal. Even if we assume that the BZA was persuaded by the City's argument, it would not matter, as the BZA's denial of the BZA Appeal was appropriate because the generator contemplated by the Application did not qualify as an accessory use under the City code in a CP-2 zoning district, a determination that is applicant neutral.

Point Four is denied.

**Conclusion**

The BZA's decision to deny the BZA Appeal is affirmed.

_____Cynthia L. Martin_____
Cynthia L. Martin, Judge

All concur